UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHTON SMITH,

    Plaintiff,

v.

    Case No. 1:23-cv-759

    Hon. Hala Y. Jarbou

SHAWN RYKSE, et al.,

    Defendants.
_____/

## **OPINION**

Plaintiff Ashton Smith, proceeding *pro se*, brings this lawsuit under 42 U.S.C. § 1983 against six Defendants employed by the Michigan Department of Corrections (MDOC): Lieutenant Shawn Rykse and Corrections Officers Joshua Rinckey, Silverio Ybarra, Unknown Young, Unknown Drescher, and Unknown Gage.  The Court construes Smith's amended complaint (ECF No. 69) as raising (1) First Amendment retaliation claims; (2) Fourth Amendment unreasonable search and seizure claims; (3) unspecified Fifth Amendment claims; (4) Eighth Amendment cruel and unusual punishment claims; (5) Fourteenth Amendment equal protection and due process claims; (6) civil conspiracy claims under 42 U.S.C. § 1983; and (7) state law claims.  Defendants now move for summary judgment on all claims (ECF No. 103).

For the reasons explained below, the Court will grant the motion in part and deny it in part. The court will grant summary judgment to Defendants as to Smith's official capacity claims for monetary relief; individual and official capacity claims for injunctive and declaratory relief; Fourth Amendment claims; Fifth Amendment claims; and Fourteenth Amendment due process claims. The court will deny summary judgment as to all other claims.

# I. BACKGROUND

The following are the facts as averred in Smith's verified amended complaint and affidavit. In May 2023, Smith was incarcerated at Ionia Correctional Facility ("ICF"). (*See* Am. Compl. ¶ 3, ECF No. 69.) On or around May 25, Smith became aware that Defendant Rinckey—who had been a corrections officer at Michigan Reformatory when Smith was there—had transferred to ICF. (*See* Smith Aff. ¶ 15, ECF No. 113-2.) Rinckey allegedly had a history of sexually abusing Smith when they were both at Michigan Reformatory: Rinckey would give Smith coffee while Smith was on suicide watch, and would ask Smith to penetrate himself and let Rinckey watch Smith masturbate. (*Id.* ¶ 16.) On May 26, 2023, Smith made a report about this misconduct under the Prison Rape Elimination Act ("PREA") to a nurse at ICF. (Am. Compl. ¶¶ 3, 12.)

A prison guard escorting the nurse indicated that he was going to tell Rinckey about the report. (*Id.* ¶ 13.) Soon after this conversation, Rinckey came to Smith's cell and said, "You[']r[e] going to f***ing snitch on me with that P.R.E.A. s***, I got a threatening behavior (ticket) for you, you're going to read about you blind n*****." (*Id.* ¶ 14.) Rinckey submitted two misconduct tickets against Smith later that day, and two more in the following days. (*Id.* ¶¶ 15–16.) He told Smith that he would "bury [him] in loss of privileges" and called him a "snitching blind n*****." (*Id.* ¶ 16.) Some of the tickets Rinckey submitted contained false accusations, while others truthfully stated that Smith had improperly covered his cell window, though corrections officers had previously declined to enforce the rule against window coverings and only started issuing misconduct tickets to Smith about it after he filed his PREA complaint. (Smith Aff. ¶¶ 23, 27–29.) On June 12, 2023, Sergeant Bledsoe discussed the PREA complaint with Smith, but refused to allow Smith to submit additional information about the sexual abuse allegations. (Am. Compl. ¶ 17.) In response, Smith filed a grievance against Bledsoe. (*Id.* ¶ 18.)

Smith claims that the grievances against Rinckey and Bledsoe led to a series of retaliatory acts by prison staff. Smith has keratoconus, an eye disease that makes him highly photophobic (sensitive to light). (*Id.* ¶ 19; *see* 5/4/2023 Medical Report, ECF No. 113-3, PageID.1251–1252.) Defendant Ybarra knew about the photophobia and repeatedly turned on the light in Smith's cell as a punishment, causing Smith "extreme pain and suffering, severe pounding headaches, painful eyes, and dizziness." (Am. Compl. ¶ 19.) Ybarra told Smith, "let[']s see if your blind n***** a** will burn like a vampire with the lights on." (*Id.*) Later that day, Ybarra said, "health care told us about your eye infections and light sensitivity . . . If you[']r[e] going to grieve us, we're going to f*** with you." (*Id.* ¶ 20.) Ybarra also told Smith that if he stopped filing grievances, he would stop getting misconduct tickets and would be allowed to keep his lights off, block the light from his cell window, and have his cell cleaned. (*Id.*) Smith refused the deal and Ybarra turned the lights on again. (*Id.* ¶ 21.)

On June 14, 2023, Rinckey wrote another false misconduct ticket that accused Smith of assaulting him and refusing to return his food tray. (*Id.* ¶ 22.) The false misconduct tickets caused Smith to lose 120 days of privileges—including exercise, yard time, and use of the telephone—and led to 30 days of "detention" and 7 days of a "food loaf" diet. (*Id.* ¶ 24.) In order to put Smith on the food loaf diet, Rinckey and Ybarra forged the deputy warden's signature. (*Id.* ¶ 25.) While Smith was on the food loaf diet, Rinckey came to Smith's cell to taunt him about the diet and told him he would soon write more misconduct tickets. (*Id.* ¶ 26.) The loss of privileges, detention, and food loaf diet caused Smith "severe headaches, itchy pe[e]ling/cracking skin, stress[,] weight loss, mental anguish and deterioration." (*Id.* ¶ 24.) On June 23, 2023, the prison held a hearing on the June 14 misconduct tickets that Rinckey had written about Smith, but Smith was not notified

3

of the hearing, and Ybarra falsely told prison officials that Smith had chosen not to attend.  (*Id.* ¶¶ 34–35, 64–65.)

On June 17, Rinckey and Ybarra told Smith that his prior grievance would "cost" him and that his cell would be "torn up tonight" by Rykse as a "message."  (*Id.* ¶ 27.)  They also said that if Smith "continue[d]" with his grievances, he would be "a dead n*****."  (*Id.*)  Later that day, while Smith was at the nursing station, other prisoners saw Rykse enter Smith's cell, tear up his legal papers, break his watch, and take his eye drop bottles.  (*Id.* ¶ 29.)  At the nursing station, Defendant Massie told Smith that Rinckey had accused him of selling eye drops, and used the accusation to justify the search.  (*Id.* ¶ 30.)  A few days later, Rinckey told Smith that if he did not "heed the warnings," Rinckey "would kill [Smith] and they would act like it was a suicide."  (*Id.* ¶ 32.)

Furthermore, during this time prison staff refused to clean Smith's cell even though it had "large amounts of caked up dried feces covering each of the cell walls, door, floor & sink faucet [from] the cell's former occupant."  (*Id.* ¶ 36.)  Beginning in May 2023, Smith repeatedly told Defendants about the problem, but they failed to address it for months.  (*See id.* ¶¶ 36–37; Smith Aff. ¶¶ 9–10.)  Exposure to the feces caused Smith "headaches, dizziness, vomiting, inability to hold down food, [and] loss of appetite."  (Smith Aff. ¶ 11.)  Smith also "developed white scaly/pe[e]ling skin on [his] hands and neck that excessively itched and burden," and he was ultimately "diagnosed with impaired skin integrity."  (*Id.*; *see* 7/26/2023 Medical Report, ECF No. 104-11, PageID.949 (containing impaired skin integrity diagnosis).)  Smith told a prison counselor about his medical issues from the feces, and the counselor replied that Smith had "brought this all on [him]self with [his] neediness and grievances."  (Am. Compl. ¶¶ 37–38.)

4

On August 11, 2023, two prisoners were assigned to power wash Smith's cell. (Smith Aff. ¶ 43.) However, when Smith returned to the cell, it had only been partially washed and there was an inch of standing water mixed with feces on the floor, desk, bed, and window ledge, as well as feces on the door and walls. (Am. Compl. ¶¶ 40–41.) Smith's mattress and towels, as well as some of his grievances and legal documents, had been soaked in the feces-filled water. (*Id.* ¶ 42.) Various items were also missing from Smith's cell, including his eye drops, toilet tissue, soap, towels, and documents. (*Id.* ¶ 43.) Later, Smith requested towels, a mop, and soap from Defendants Drescher, Gage, and Young, and asked them why his cell hadn't been properly cleaned. (*Id.* ¶ 44.) Gage responded, "I'm not giving you anything[,] you can use that lawsuit to dry up that s*** water Smith. Rethink that s*** with Rinckey and rethink it fast!" (*Id.* ¶ 45.) Young also referred to the lawsuit that Smith had filed against Rykse—i.e., this lawsuit—and told him that "no one is giving you anything but s***, tickets[,] restrictions and hunger pains," then called him a "blind n*****." (*Id.* ¶ 46.) Later, one of the prisoners who had been assigned to clean the cell told Smith that Drescher, Gage and Young had ordered him to leave feces in the cell because Smith was "ratting on [their] boys." (*Id.* ¶ 48.) Another prisoner saw Drescher reading Smith's legal documents, as well as taking his antibiotic eyedrop bottles. (*Id.* ¶ 49.) Smith remained in his dirty cell until August 15, 2023, and alleges that the feces caused "nausea, dizziness, vomiting[,] headaches, weight loss, extreme stomach pains/cramping, blackouts, [and] skin pe[e]ling/itchiness." (*Id.* ¶¶ 50, 53.)

On August 16, 2023, when Rinckey came to Smith's cell to deliver food, he accused Smith of "snitching," said Smith would "learn not to file lawsuits on [Rinckey]," and threw the food on the floor. (*Id.* ¶¶ 55–56.) Later that day, when Rinckey returned with another meal, he told Smith "f*** your lawsuit" and said that Smith "better stop ratting." (*Id.* ¶¶ 57–58.) Rinckey then said,

5

"I'll show you what we do to rats[,] we feed them poison," and dumped Smith's food on the floor again. (*Id.* ¶ 58.) On subsequent days Rinckey continued to throw Smith's food on the floor rather than allowing him to eat it, and the deprivation of food resulted in mental anguish, hunger pains, and weight loss. (*Id.* ¶¶ 60–61.) When Smith arrived at ICF in April of 2023, he weighed about 244 pounds; in December of 2023, he weighed 179 pounds. (Smith Aff. ¶ 12; *see* 3/23/2025 Medical Report, ECF No. 113-24, PageID.1390.) Smith was also diagnosed with a vitamin D deficiency in January of 2024; he attributes the deficiency in part to the restrictions on his exercise and yard time, which deprived him of sunlight. (Am. Compl. ¶ 67.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### III. ANALYSIS

**A. Sovereign Immunity**

Smith brings his claims against Defendants in their official and individual capacities, and seeks monetary, injunctive, and declaratory relief. The official capacity claims for monetary relief are functionally against the MDOC, and thus are barred by sovereign immunity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As to the claims for injunctive and declaratory relief, under *Ex Parte Young*, 209 U.S. 123 (1908), a claim against a government official is not barred by sovereign immunity if it is based on "an ongoing violation of federal law" and the plaintiff "seeks relief properly characterized as prospective." *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). Because Smith is no longer at ICF (Am. Compl. ¶ 3), the legal violations he alleges are not ongoing, so the *Ex Parte Young* exception does not apply. For the same reason, Smith lacks standing to seek injunctive or declaratory relief. *See Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).

In sum, the Court will grant summary judgment to Defendants on Smith's official capacity claims for monetary relief and his official and individual capacity claims for injunctive and declaratory relief.

**B. First Amendment Claims**

Smith alleges that Defendants retaliated against him for filing grievances and this lawsuit. To establish a prima facie case of retaliation, a plaintiff must show that

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  Defendants contend that Smith cannot establish any of the three elements of a prima facie case.

Smith avers that the following instances of retaliation occurred: (1) Rinckey submitted false misconduct tickets because Smith filed a PREA grievance against him; (2) Ybarra turned on Smith's light despite his photophobia because Smith filed a grievance against Rinckey and/or Bledsoe; (3) Rykse tore up Smith's cell, broke his watch, and took his eye drop bottles because of the grievances; (4) Rinckey threatened to kill Smith because of the grievances; (5) Ybarra did not inform Smith about the misconduct ticket hearing because of the grievances; (6) Defendants subjected Smith to race-based harassment because of the grievances;  (7) Defendants refused to clean Smith's cell because of the grievances; (8) Drescher, Gage, and Young took Smith's soap, towels, and other items and refused to give Smith cleaning supplies because he filed this lawsuit; and (9) Rinckey threw Smith's food on the floor because he filed this lawsuit.

### 1. Protected Conduct

Smith argues that the grievances he filed against Rinckey and Bledsoe, as well as this lawsuit, constitute protected conduct.  Defendants respond that the PREA grievance against Rinckey does not constitute protected conduct because it contained false allegations and thus was frivolous.  See *Clark v. Johnston*, 413 F. App'x 804, 812 (6th Cir. 2011) ("[A]n inmate's pursuit of grievances against prison officials can constitute protected conduct for purposes of a retaliation claim, but 'only to the extent that the underlying claims ha[ve] merit.'" (second alteration in original) (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000))).  As evidence, Defendants point to Rinckey's declaration in which he denies the allegations and claims he did not interact with Smith or other prisoners while at Michigan Reformatory.  (Rinckey Decl. ¶¶ 13–16.)  In response, Smith points to grievances he filed while at Michigan Reformatory that name

Rinckey, indicating the two did interact while Smith was incarcerated there. (2018 Grievances, ECF No. 113-5, PageID.1257–1258.) Furthermore, Smith's affidavit attesting to the truth of his allegations against Rinckey creates a genuine issue of fact as to the frivolousness of his grievance. Thus, Smith has established the first element of a prima facie retaliation case.

### 2. Adverse Action

Defendants do not dispute that the conduct described by Smith constitutes a series of adverse actions; rather, they argue that much of the conduct did not actually occur, and point to their own declarations as evidence. But this argument mistakes the purpose of summary judgment. Defendants' declarations, when paired with Smith's affidavit, create a dispute of fact that cannot be resolved at this stage. And contrary to Defendants' contention, Smith's allegations are not "fanciful, fantastic, delusional, wholly incredible, or irrational." *Ford v. Harvey*, 106 F. App'x 397, 399 (6th Cir. 2004). Thus, Smith has established the second element of a prima facie retaliation case.

### 3. Causation

Defendants argue that Smith cannot establish a causal connection between his protected conduct and their alleged adverse actions. "A plaintiff successfully demonstrates a causal connection between the adverse action and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against plaintiff." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010). Here, Smith presents direct evidence of retaliatory motive as to some Defendants. Rinckey referenced the grievance against him and the fact that Smith had "snitched" when he threatened to file misconduct tickets against Smith and take away Smith's privileges. (Am. Compl. ¶¶ 14, 16.) Rinckey also referenced Smith's lawsuit against him when he threw Smith's food on the floor. (*Id.* ¶¶ 55–58.) Ybarra referenced Smith's grievances when he refused to turn off

Smith's light or clean his cell. (*See id.* ¶ 20.) Gage and Young both referred to Smith's lawsuit when they refused to provide him with cleaning supplies. (*Id.* ¶¶ 45–46.)

The evidence as to other Defendants' motives is more indirect. Before Rykse tore up Smith's cell and destroyed his documents, Rinckey and Ybarra told Smith that Rykse was going to send Smith a "message" in response to his grievance. (*Id.* ¶ 27.) Insofar as Rinckey and Ybarra's statement attributed a motive to Rykse, it is hearsay and cannot be considered at summary judgment for that purpose. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). However, Rinckey and Ybarra's statements can be used to establish *their* motives, and the fact that they mentioned Rykse's intended "message" before it occurred provides circumstantial evidence that he shared their retaliatory motive. The evidence against Drescher is also less direct—he refused to give Smith cleaning supplies along with Gage and Young, but did not explicitly mention the lawsuit as a reason. However, the fact that he was part of the conversation in which Gage and Young attributed the denial of cleaning supplies to Smith's lawsuit supports the reasonable inference that his refusal to provide cleaning supplies was similarly motivated. Finally, the only direct evidence that Defendants' refusal to clean Smith's cell for months was motivated by retaliation comes from another prisoner's claims about what Drescher, Gage, and Young had told him. (*Id.* ¶ 48.) However, because Defendants' refusal to clean the cell occurred during a span of time when they each took actions in connection with a retaliatory motive, it is reasonable to infer that the refusal to clean the cell was similarly motivated.

As to causation, Defendants again argue that many of the alleged adverse actions did not occur. They cite their own declarations in which they deny taking the adverse actions, or acting with any retaliatory motive, or even knowing that Smith had filed a PREA grievance against

10

Rinckey.  As discussed above, Smith's evidence contradicts these assertions, so he has sufficiently created a factual dispute.

Defendants also argue that they could not have retaliated due to this lawsuit because service was stayed until after August 16, 2023, so the alleged adverse actions took place before they would have known about the lawsuit.  This lawsuit was filed on July 17, 2023.  According to Smith, Gage and Young referred to his lawsuit on August 11 when they refused to give him cleaning supplies, and Rinckey referred to the lawsuit on August 16 when he threw Smith's food on the floor.  As Smith points out, even though service had not yet taken place, Defendants may have learned of the lawsuit from reading his legal documents, some of which went missing during the August 11 cleaning.  Drawing all reasonable inferences in Smith's favor, he has created a genuine issue of fact as to whether the August 11 and August 16 actions were a response to the lawsuit.

In sum, Smith has established the third element of a prima facie retaliation case.

### 4. Alternative Explanation

"If the plaintiff meets his burden of establishing retaliation, the burden shifts to defendants to prove by a preponderance of the evidence that the [adverse] decision would have been the same absent the protected conduct." *Eckerman*, 636 F.3d at 208 (quotation marks omitted).  "Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* Unlike in other retaliation contexts, "the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012).

As to most of the alleged adverse actions, Defendants do not (and cannot) argue that they would have taken the same actions absent a retaliatory motive because they deny they took the actions at all.  Defendants do argue that some of the alleged adverse actions—presumably the filing

11

of misconduct tickets—were in response to Smith's own conduct. But this argument fails because—according to Smith—Rinckey explicitly told him that he was filing misconduct tickets for retaliatory reasons. And though Defendants contend that Rinckey would have filed the tickets anyway due to Smith's misconduct, Smith denies that he committed much of the misconduct alleged in the tickets, and claims that some tickets were based on policies that had previously not been enforced. Thus, a reasonable jury could find that Rinckey (and the other Defendants) acted due to a retaliatory motive, and Defendants are not entitled to summary judgment.

### C. Fourth and Fifth Amendment Claims

Smith alleges that Defendants violated his Fourth Amendment rights by searching his cell and destroying some of his legal documents. In its screening opinion, this Court held that Smith had failed to state a Fourth Amendment claim in his initial complaint because he lacked a privacy interest in the contents of his prison cell. *See Hudson v. Palmer*, 468 U.S. 517, 522–530 (1984). Defendants argue that the Fourth Amendment claims in Smith's amended complaint fail for the same reason, and Smith expressly concedes this point in his response. (Pl.'s Br. in Opp'n 103, ECF No. 113.) Thus, the Court will dismiss Smith's Fourth Amendment claims.

Smith refers to the Fifth Amendment in his amended complaint, but he does not clarify what clause of that amendment has been violated. The Court dismissed Smith's Fifth Amendment claims when it screened his initial complaint, and Smith concedes in his response brief that his Fifth Amendment claims should be dismissed again. (*Id*.) Thus, the Court will dismiss these claims as well.

### D. Eighth Amendment Claims

"To make out a claim under the Eighth Amendment, [a] prisoner must satisfy both an objective and a subjective component." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Id*. (quoting

12

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The subjective component focuses on the state of mind of the prison officials," and "[t]he relevant inquiry is 'whether [they acted] in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Williams*, 631 F.3d at 383 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).

The Court construes the following acts as giving rise to cruel and unusual punishment claims: Defendants forced Smith to stay in a feces-covered cell for months; Ybarra turned on Smith's light for the purpose of causing him pain; and Rinckey deprived Smith of food by throwing it on the floor. Defendants respond only to the first point, arguing that Smith's cell was not, in fact, covered in feces. Once again, Defendants mistake the standard applicable at summary judgment. Defendants' evidence that there was not feces on Smith's walls is insufficient to entitle them to summary judgment, because Smith has submitted directly contrary evidence. Defendants do not contest that Smith's affidavit, if true, establishes an Eighth Amendment violation.

Defendants also suggest that the conditions in Smith's cell cannot have been as dire as he claims because he repeatedly refused to be transferred to a different unit. However, Smith asserts that the unit to which Defendants tried to transfer him was incapable of accommodating his visual impairment and that he would have faced significant risk of injury in trying to navigate that unit. (Smith Aff. ¶¶ 53–59.) Ultimately, Defendants have not established that no factual dispute exists as to the conditions in Smith's cell, so they are not entitled to summary judgment on his Eighth Amendment claims.

### E. Fourteenth Amendment Claims

#### 1. Due Process

Smith alleges that Defendants violated his procedural due process rights by filing false misconduct tickets against him, failing to provide notice of a hearing about those tickets, and falsely claiming that he had chosen not to attend that hearing. The due process clause is only

13

implicated when the government deprives a person of life, liberty, or property. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). A misconduct finding does not itself implicate a liberty interest. *See Sandin v. Conner*, 515 U.S. 472, 487 (1995); *Nali v. Ekman*, 355 F. App'x 909, 912 (6th Cir. 2009). Thus, whether Defendants' conduct constitutes a procedural due process violation depends on the deprivation it caused Smith. Smith avers that the misconduct findings caused him to lose privileges (exercise, telephone access, and yard time) for 120 days and be placed on a food loaf diet for 7 days. Smith also attests that he was placed in "detention" for 30 days, which the Court construes as a reference to disciplinary segregation.

A change in an inmate's conditions of confinement only implicates a liberty interest if it places "an 'atypical and significant hardship on the inmate'" relative "to the ordinary incidents of prison life." *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) (quoting *Sandin*, 515 U.S. at 484). In *Sandin*, the Supreme Court held that a 30-day span of disciplinary segregation did not implicate a liberty interest. 515 U.S. at 485–86. And none of the other restrictions that Smith faced due to the misconduct process constitute an atypical or significant hardship compared to standard conditions of confinement. Thus, Smith had no liberty interest at stake in the misconduct process, and any issues with that process do not constitute a due process violation.

Smith's assertions that Defendants destroyed his legal documents and took his eyedrops from his cell can also be construed as allegations of due process violations. In *Palmer*, the Supreme Court held that a corrections officer's destruction of a prisoner's legal documents did not constitute a deprivation of property without due process. 468 U.S. at 531–36. The Court reasoned that when a state official's action is "random and unauthorized" rather than "pursuant to established state procedure," the provision of a pre-deprivation remedy is impractical, so a state need only provide adequate post-deprivation remedies to satisfy due process. *Id.* at 532. The

14

Court held that the ability to file a state tort lawsuit was a sufficient post-deprivation remedy. *Id.* at 534–35.  Here, Smith does not contest that Michigan law provides adequate tort remedies for the conversion of property, so he has not stated due process claims.

### 2. Equal Protection

Smith's initial and amended complaint both refer to the Fourteenth Amendment.  (Compl. ¶ 34, ECF No. 1; Am. Compl. ¶ 70.)  When the Court screened Smith's initial complaint, it held that Smith had stated Fourteenth Amendment equal protection claims based on the allegation that Defendants used racial slurs while subjecting him to mistreatment.  (8/16/2023 Op. 11–12, ECF No. 11.)  Smith's amended complaint contains the same allegations of racist language.  However, Defendants suggest that because Smith referred to procedural due process in his amended complaint, he means to only bring Fourteenth Amendment due process claims rather than equal protection claims.  (Def.'s Br. in Supp. 2, ECF No. 104.)  Thus, Defendants make no argument as to why Smith has not established his equal protection claims.  Because there is no reason to think Smith has abandoned the equal protection claims that the Court recognized in its screening opinion, these claims will survive summary judgment.

### F. Other Claims

The Court also construes Smith's complaint as raising a civil conspiracy claim under 42 U.S.C. § 1983 (*see* Am. Compl. ¶ 47 (alleging that Drescher, Young, and Gage "agreed" to violate Smith's rights); Smith Aff. ¶ 75 ("[E]ach defendant entered into an agreement with one another to punish me . . .")), as well as state law claims (*see* Am. Compl. ¶ 70 (alleging negligence and other torts)).  Defendants make no argument as to these claims, so the Court will not grant summary judgment on them.

### G. Qualified Immunity

Defendants argue that they are entitled to qualified immunity from Smith's claims. Qualified immunity protects government officials carrying out discretionary duties from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants contend that they are entitled to qualified immunity because Smith has not established violations of his First Amendment or Eighth Amendment rights. As discussed above, the Court rejects this argument, and restating it in the form of a qualified immunity defense does not change the analysis. However, to overcome qualified immunity, Smith must also establish that the rights at issue were clearly established. Because Defendants only raise qualified immunity as to the First and Eighth Amendment claims, the Court will address only those claims here.

As to the First Amendment claims, the right of prisoners to be free from retaliatory government action is clearly established. *See Bell v. Johnson*, 308 F.3d 594, 608–13 (6th Cir. 2002). As early as 1994, "a reasonable official would have been aware that . . . conducting harassing cell searches and confiscating an inmate's legal papers and medical dietary supplements in retaliation for the inmate's exercise of his right of access to the courts would give rise to constitutional liability." *Id.* at 612. By that point, Sixth Circuit case law had established that "an injury inflicted in retaliation for an inmate's protected conduct need not be severe to be actionable." *Id.* Here, Defendants' alleged adverse actions are similar to or more extreme than the conduct in *Bell*, so they should have reasonably known those alleged actions would violate the First Amendment.

As to the Eighth Amendment claims, Defendants' qualified immunity argument is focused only on Smith's cell conditions. A reasonable officer would know that keeping a prisoner in a

16

feces-covered cell for months violates his Eighth Amendment rights. *See Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam) (keeping prisoner in feces-covered cell for six days violated clearly established rights). Thus, Defendants are not entitled to qualified immunity.

## IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part the motion for summary judgment. The court will grant summary judgment to Defendants as to Smith's official capacity claims for monetary relief; individual and official capacity claims for injunctive and declaratory relief; Fourth Amendment claims; Fifth Amendment claims; and Fourteenth Amendment due process claims. Smith's surviving claims are his First Amendment claims; Eighth Amendment claims; Fourteenth Amendment equal protection claims; § 1983 civil conspiracy claim; and state law claims.

An order will issue in accordance with this Opinion.

Dated: November 14, 2025        /s/ Hala Y. Jarbou
                                HALA Y. JARBOU
                                CHIEF UNITED STATES DISTRICT JUDGE